**UNITED STATES of America**

v.

**Irving MAIDMAN, Defendant and Third-Party Plaintiff,**

v.

**The CITY OF NEW YORK, and Battery Park City Authority, Third-Party Defendants.**

**No. 71 Civ. 3140.**

United States District Court,
S. D. New York.

Oct. 8, 1971.

Whitney North Seymour, Jr., U. S. Atty., New York City, by T. Gorman Reilly, Asst. U. S. Atty., for the United States.

Lans, Feinberg & Cohen, New York City, for defendant and third-party plaintiff.

J. Lee Rankin, Corp. Counsel, New York City, for third-party defendant City of New York.

Samuel Brooks, New York City, for third-party defendant Battery Park City Authority.

## MEMORANDUM OPINION

MOTLEY, District Judge.

### I. *Findings of Fact*

This case concerns a waterfront structure known as Pier 17 located in Manhattan on the Hudson River, a navigable waterway of the United States. Since 1962 it has been owned by defendant and third-party plaintiff Irving Maidman (Maidman).

Pier 17 is located in an area of the Hudson River which is subject to a lease agreement entered into between the third-party defendants City of New York (City) and Battery Park City Authority (Authority). The terms of the lease require the City to acquire by eminent domain defendant Maidman's interest in Pier 17 within ninety (90) days of a request by the Authority, and then to convey the premises to the Authority. However, the Authority has not yet requested condemnation and delivery of defendant's interest in Pier 17, and does not intend to do so until at least 1974.

Pier 17 is approximately 900 feet long and 75 feet wide. It consists of wooden pilings, a wooden deck, and a tall, one-story superstructure made of steel trusses, corrugated metal siding and a wooden roof. The superstructure runs the length of the pier. At intervals along both sides

of the superstructure are wide loading door openings. For the last few years piles of rubble, mainly masonry, have covered most of the deck. There is a continuous row of windows along the upper portion of both sides of the superstructure.

On July 7, 1971 a massive fire of undetermined cause broke out at Pier 17, requiring 180 firemen and many firefighting vehicles to extinguish. In the course of suppressing the blaze, the Fire Department cut a trench across the width of the pier, causing timbers and wooden debris to fall into the Hudson. This trench was necessary because the fire hose access holes on the deck were buried under mounds of rubble. Large quantities of burning and charred roofing boards were carried upward by the rising heat and smoke and then fell into the river. Other boards and debris were swept into the river by the force of powerful sprays from the fire boats used to extinguish the blaze.

Debris loosened by the fire continued to fall into the Hudson after the blaze was put out, prompting the United States to seek a preliminary and permanent injunction against further violations of 33 U.S.C. §§ 407, 411, 441. On July 14, 1971, the date the complaint was filed, Judge Irving Ben Cooper of this Court signed a temporary restraining order which, with the consent of defendant Maidman, has continued in force to this date.

On July 26, 1971, Maidman filed a third-party complaint against the City of New York and the Battery Park City Authority seeking to have any injunctive relief ordered run against the third-party defendants rather than him.

On August 27, 1971, upon the Government's petition, the Court signed an order to show cause in criminal contempt for violation of the temporary restraining order by Irving Maidman.

Hearings were held on August 24, 25, and 31, 1971, September 1 and 2, 1971, and October 6, 1971 on all of these matters. The parties have stipulated that evidence taken at any of the hearings may be considered in reaching findings of fact and conclusions of law on any matter in the case. The court visited and inspected Pier 17 on September 28, 1971.

Pier 17 is currently in a thoroughly dilapidated condition, and is unsuited for virtually any commercial use. In fact, the pier has not been used commercially for over four years, except as a berth for the "Peace Ship." The pilings and deck of the pier are structurally sound, but the superstructure is extensively damaged.

Approximately 75 feet of the westernmost portion of the superstructure has collapsed in a heap on the deck, at points jutting out from the deck over the river. Interlaced with the fallen steel trusses are charred timbers and other debris.

The remainder of the superstructure, though still standing, is far from intact. Many, if not most, of the roofing boards are missing. Of those remaining, a significant portion are loose and charred; others are only tenuously attached. Both rows of windows along the upper sides of the superstructure have been knocked out. Aside from the rubble which covers most of the deck, timbers and other burnable debris are present inside the superstructure. As of September 28, 1971 there were large openings in the sides of the superstructure.

Defendant, pursuant to the temporary restraining order issued by Judge Cooper, had constructed a log boom around the pier in an effort to contain debris from the pier that falls into the river. However, this boom did not hold. Moreover, the boom did not enclose all four sides of the pier. That is, it did not form a full and unbroken rectangle or oval around the portion of the pier that stands in the river.

In the pier's present state, there is a strong likelihood that winds, with the force to be expected for that location, will cause numbers of the remaining roof boards to be blown into the river. There is also a likelihood that loose timbers

and debris will be swept from the deck into the water. Winds, in combination with high tides and inclement weather, may carry away wooden debris resting in the collapsed steel beams at the end of the pier.

Pier 17, in its present condition, is a fire hazard. Not only are the chances of a fire starting relatively great, but, a fire, once started, would be difficult to extinguish because of the pier's lack of equipment to prevent or control a blaze. Neither the sprinkler system nor the standpipe system (connections for fire hoses at points on the pier) is operative. At least two thirds of the fire hose access holes in the deck are buried under heavy rubble. These holes, when operative, enable firemen to douse substructural fires, and their inaccessibility prolonged the fire of July 7, 1971. These and other conditions have been found to be violations of Fire Department regulations by the Criminal Court of the City of New York.

At the present time, unauthorized persons can easily get into the pier; enhancing the chances of a fire's outbreak. Neither the street entrance nor the many openings along the pier's sides is securely closed. Security patrols are either sporadic or nonexistent.

The July 7, 1971 blaze dramatically demonstrated the amount of debris that a fire and the efforts to extinguish it produce. Thus, the greater the risk of fire, the greater the chance of more wood and debris being swept into the Hudson. Correspondingly, the more the chances of fire are diminished, the less likely it is that great quantities of material will be dislodged from the pier.

If, for any reason, timbers or wooden debris are discharged from Pier 17 they can cause serious damage to propellers, wheels, and hulls of vessels, and impede and obstruct navigation.

## II. Conclusions of Law

### A. Injunctive Relief Against Irving Maidman.

■ Section 13 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 407, forbids the discharge from the shore or wharf of "any refuse matter of any kind or description whatever" into a navigable water of the United States. It also forbids the placing of any material on the banks of a navigable body of water where the material is liable to be washed into the water by tides, storms, floods or otherwise and thus impede or obstruct navigation.[1] The court finds that defendant Maidman's failure to properly enclose the deck, remove the loose boards, and construct an adequate log boom caused the discharge of refuse into a navigable body of water, the Hudson River, and caused the placing of material on the banks of that river where such material is liable to be washed into the water. United States v. Federated Homes, Inc., 68 Cr. 574 (S.D.N.Y. Nov. 24, 1969).

It is further unlawful to discharge or deposit "refuse . . . or any other matter of any kind" in the waters of New York Harbor. 33 U.S.C. § 441.[2] Defendant's acts constitute a violation of this section also.

---

1. Section 407 of 33 U.S.C. provides in pertinent part:

   "It shall not be lawful to . . . discharge, or deposit or cause, suffer, or procure to be . . . discharged or deposited . . . from the shore [or] wharf . . . any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States . . . ; and it shall not be lawful to deposit, or cause, suffer, or procure to be deposited material of any kind in any

   place on the bank of any navigable water . . . where the same shall be liable to be washed into such navigable water, either by ordinary or high tides, or by storms or floods, or otherwise, whereby navigation shall or may be impeded or obstructed. . . .

2. Section 441 of 33 U.S.C., in pertinent part makes unlawful

   "The placing, discharging, or depositing, by any process or in any manner, of refuse . . . or any other matter of any kind . . . in the waters of [New York Harbor]."

The continued discharge of wood timbers, debris and other material from Pier 17 will cause immediate and irreparable damage to the safety of navigation in the waters of New York Harbor and the Hudson River. Floating debris can damage vessels, particularly smaller ones, and endanger the safety of their occupants. Because it is so difficult to determine the source of any floating timber, the owner of any damaged craft, or any injured occupant, lacks an effective civil remedy of his own.

The United States may seek to enforce 33 U.S.C. §§ 407, 441 through injunctive relief. United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903, (1960); id., 286 F. 2d 875 (7th Cir. 1961).

Therefore, defendant Irving Maidman is enjoined and ordered to cease discharging refuse material into the Hudson River, and immediately to:

1) remove all free and loose boards, timbers and other combustible debris from

(a) the roof of the superstructure,

(b) the windows or window frames of the superstructure,

(c) the collapsed section of the superstructure,

(d) the deck of the pier;

2) uncover, free, and make accessible to fire fighting equipment, all fire access holes on the deck of the pier;[3]

3) clear lanes on the deck leading to all fire access holes sufficient for the use of fire fighting apparatus;

4) install a fully operable standpipe system in compliance with New York City Fire Department regulations, and otherwise comply with the regulations of the New York City Fire Department;

5) securely and completely cover and lock all doors and loading openings in the sides of the pier and cover all open and broken windows;

6) immediately construct an effective, unbroken log boom around the pier on all four sides properly secured, as directed by the United States Army Corps of Engineers;

7) at least once each week:

(a) inspect the condition of the pier and boom and make all necessary repairs;

(b) remove any debris in the water enclosed by the boom,

(c) remove any loose timbers or other material from the deck, roof and superstructure of the pier,

(d) securely cover any holes in the superstructure through which a person could enter,

(e) otherwise insure that the conditions of this order are being met

8) file with the United States Attorney for this District monthly reports as to his compliance with this order.

The temporary restraining order signed on July 14, 1971 and continued in effect by consent of the parties is hereby vacated. Judgment is awarded to plaintiff with costs.

**B.** *Injunctive Relief Against City of New York and Battery Park City Authority*

Defendant Maidman contends that the City and the Authority have *de facto* condemned Pier 17 and are thus the real parties in interest. He thus seeks to compel the third-party defendants to comply with whatever relief the United States is granted against him.

The traditional basis for injunctive relief is irreparable harm and inadequacy of legal remedies. Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506–07, (1959); Reed Enterprises v. Corcoran, 122 U.S.App.D.C. 387, 354 F. 2d 519, 522 (1965). Third-party plaintiff Maidman has shown neither. The denial of Maidman's motions for injunctive relief does not reach the question of

---

3. Defendant is not required to remove the masonry debris from the pier. He is required to remove such debris from the fire access holes on the deck of the pier. He is also required to remove all loose boards on the deck of the pier.

**400**

whether a *de facto* condemnation has, in fact, occurred, or whether defendant may be entitled to recover in an action over against the third party defendants.

### C. *Criminal Contempt Against Irving Maidman*

The Government has moved to find defendant Maidman in contempt of the temporary restraining order issued against him on July 14, 1971 and continued in effect until this date. That order: 1) restrains the defendant from "permitting or causing any discharge or deposits of timbers and sheathing from Pier 17," and 2) orders him "to take all necessary steps to commence immediately with the installation of an effective log boom around the pier and to assign personnel with sufficient equipment to tend the boom and remove any refuse floating within it."

■ If defendant Maidman were to be found in contempt at all, it would have to be of the second portion of the order, quoted above. The court finds this order too imprecise to serve as a basis for a contempt conviction. For a person to be found in contempt of a temporary restraining order he must know with fair specificity what he has been ordered to do. N.L.R.B. v. Deena Artware, 261 F. 2d 503, 509 (6th Cir. 1959), rev'd on other grounds, 361 U.S. 398, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960); Bristol-Myers Co. v. F.T.C., 284 F.Supp. 745, 747 (D. D.C.1968).

■ Here, there is no indication of what constitutes "all necessary steps" for commencement of installation of a boom. Nor is defendant advised of what steps to take after commencing to install the boom. Defendant here has indeed commenced its installation; he has not effectively completed the boom, but that requirement is not spelled out with clarity in the temporary restraining order. Similarly, there is no definition of the kind or number of personnel defendant must assign to tend the boom, or what will constitute "sufficient equipment" for that task.

Because of the imprecision in the order's language, the court would be unable to find defendant guilty of contempt beyond a reasonable doubt. Michaelson v. United States ex rel. Chicago St. P., M. & O. Ry. Co., 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162 (1924). Defendant is found not guilty of criminal contempt.

Submit order on 5 days notice.