UNITED STATES of America,
Plaintiff, Appellee,

v.

WHITE FUEL CORPORATION,
Defendant, Appellant.

No. 73–1397.

United States Court of Appeals,
First Circuit.

Argued April 12, 1974.

Decided June 13, 1974.

2. Cf. Lynch v. Travelers Indemnity Co., 452 F.2d 1065, 1067 (8th Cir., 1972).

620

David A. Luttinger, New York City, with whom David M. Roseman, H. Theodore Cohen, and Tyler & Reynolds, Boston, Mass., were on brief, for appellant.

Alan R. Hoffman, Asst. U. S. Atty., Boston, Mass., on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

White Fuel Corporation was convicted after a jury-waived trial of violating Section 13 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 407 [the Refuse Act].[1] White Fuel operates a tank farm abutting a small cove off the Reserved Channel, part of Boston harbor. Both the cove and the channel are navigable waters of the United States. On May 3, 1972, the Coast Guard found oil in the

---

1. "It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of . . . the shore [or] . . . manufacturing establishment . . . any refuse matter of any kind or description . . . into any navigable water of the United States, . . ."

water of the cove. White Fuel, which in January 1972 had been alerted by state authorities to possible oil spoilage problems, immediately undertook to clean up the oil and to trace its source. Although at first an oil-water separator and later a leaky pipe were suspected, experts called in by White Fuel finally determined that the oil was seeping from an immense accumulation (approximately half a million gallons) which had gathered under White Fuel's property.[2] White Fuel concedes, and the court found, that it owned the oil, which continued to seep into the cove throughout the summer of 1972 even though White Fuel worked diligently to drain or divert the accumulation. By September it was successful and seepage had ceased. As part of its clean-up efforts, and to prevent the oil from spreading, White Fuel had installed booms across the mouth of the cove. There was testimony that on occasion these booms were tended improperly, so that some of the oil drifted out into the channel.

The district court found that the seepage was a violation of the Refuse Act and imposed a $1,000 fine.[3] The court denied White Fuel's motion for judgment of acquittal and, ruling that intent or scienter is irrelevant to guilt, also denied White Fuel's offer to present evidence that it had not known of the underground deposit, had not appreciated its hazards, and had acted diligently

when the deposit became known. The court held that White Fuel's only defense would be to show that third parties caused the oil seepage—that "this oil escaped from a source other than that under the control of the defendant". White Fuel contends that the government was required to prove scienter or at least negligence as part of its case, and that the court erred by precluding the proffered defense.

■ The government disagrees, and as an alternative ground for affirmance also urges that the evidence of improper booming was sufficient by itself to support the conviction. We do not accept this latter point. The Refuse Act does not make it unlawful to fail to mitigate the consequences of a discharge of refuse. Section 407 prohibits discharge or deposit of refuse "either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind . . ." Once the oil was in the cove it was in navigable waters; the offense was complete and we can find nothing in § 407 penalizing its subsequent movement to adjacent waters.[4] Neither the information filed nor the bill of particulars provided by the government alleged improper booming to be an offense; the crime charged was allowing a large quantity of oil to seep from the ground. Although the court admitted evidence[5] on the boom-

2. The court found that the oil leached from "oil deposits that had laid dormant for years [under] land owned by the defendant . . ." One government witness, a Coast Guard lieutenant, testified without objection that White Fuel's superintendent had "recalled . . . that if they had a bad load of oil or some waste oil they would dump it in this area on the ground. . . . back . . . ten or twenty years when it was a wholly acceptable thing to do . . ." Although no one knew for sure, it was theorized that some of the oil had built up in the ground due to past leaks from tank bottoms or pipes. White Fuel's operations manager denied that a dumping policy had existed, and testified that all tanks and pipes were sound. He did state, however, that White Fuel was raising its pipes above ground be-

cause underground pipes could leak without detection and because preventive maintenance was impossible.

3. The offense, a misdemeanor, allows a maximum fine of $2,500 and a year's imprisonment.

4. United States v. Maidman, 340 F.Supp. 395 (S.D.N.Y.1971), a civil proceeding, is inapposite.

5. White Fuel objected to the admission of any evidence concerning the leak from the booms, claiming that such evidence would be irrelevant and prejudicial. However, in actions tried without a jury the court has broad authority to admit contested evidence. See F.R.Civ.P. 43(c). White Fuel's claim of reversible error is in addition undercut by

ing, it rested its findings of liability solely on the "spillage within the channels of Boston Harbor from the defendant's property". It is true that the court remarked at sentencing that "the law was violated" by the improper booming, but it said this in the context of its inquiry for sentencing purposes into White Fuel's diligence in containing the oil. We look to the court's earlier findings for the basis of its determination of guilt.

■ Thus the sole question for us to decide is whether the conviction is supported by the undisputed fact that oil owned by White Fuel leached from its property into adjacent navigable waters. White Fuel first insists that this sort of seepage is not even covered by the Refuse Act because it did not "throw, discharge, or deposit" oil, and that since it did not know the oil was entering the cove it did not "suffer" the discharge. But a defendant which allows its own oil to be discharged, even unwittingly, seems to us in everyday language to "suffer" the discharge. That the discharge was more of an indirect percolation than a direct flow is, of course, immaterial. United States v. Granite State Packing Co., 470 F.2d 303 (1st Cir. 1972); United States v. Esso Standard Oil Co., 375 F.2d 621 (3d Cir. 1967).

■■ There is no greater merit in White Fuel's next argument, that common law *mens rea* had to be alleged or proven.[6] In Scow No. 36, 144 F. 932, 933 (1st Cir. 1906), we upheld a libel against a scow for the discharge of refuse, saying that "the penalty is supposed to attach without regard to the question of wilfulness or intent, and without regard to the question of mistake or innocence." *Accord,* United States v. Ballard Oil Co., 195 F.2d 369 (2d Cir. 1952). *Cf.* Jaycox v. United

States, 107 F. 938 (2d Cir. 1901) (1888 statute; forbear of Refuse Act). In the seventy-five years since enactment, no court to our knowledge has held that there must be proof of scienter; to the contrary, the Refuse Act has commonly been termed a strict liability statute. *See* United States v. United States Steel Corp., 328 F.Supp. 354 (N.D.Ind.1970), aff'd, 482 F.2d 439 (7th Cir.), cert. denied, 414 U.S. 909, 94 S.Ct. 229, 38 L. Ed.2d 147 (1973); United States v. Interlake Steel Corp., 297 F.Supp. 912 (N. D.Ill.1969). The offense falls within the category of public welfare offenses which

> "are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. . . . The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities." Morissette v. United States, 342 U.S. 246, 255–56, 72 S.Ct. 240, 246, 96 L. Ed. 288 (1952).

*See* United States v. Balint, 258 U.S. 250, 252–253, 42 S.Ct. 301, 66 L.Ed. 604 (1922); Sayre, Public Welfare Offenses, 33 Colum.L.Rev. 55 (1933).

■ We do not accept White Fuel's further argument that if the government need not prove scienter it must at least prove negligence. Actually, merely by showing that White Fuel's oil escaped into public waters, the government presented facts from which negligence could be inferred. *See* Restatement (Second) of Torts § 328D. The real issue is not the government's prima facie case, which was sufficient by any standard, but whether due care—lack of neg-

---

its contention throughout the trial that its efforts to contain the flow and ameliorate its consequences were relevant in defense and mitigation.

6. The Supreme Court reserved the question in United States v. Standard Oil Co., 384 U.S. 224, 230, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966).

ligence—is available as a defense. In the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 et seq., Congress imposed criminal penalties only upon any person who "willfully or negligently" violates its prohibitions, 33 U.S.C. § 1319(c)(1), but provided civil penalties for all violations. 33 U.S.C. § 1319(d). In the Refuse Act, on the other hand, Congress made no such distinction, and we have been told to read the latter "charitably in light of the purpose to be served," United States v. Republic Steel Corp., 362 U.S. 482, 491, 80 S.Ct. 884, 890, 4 L.Ed.2d 903 (1960). The dominant purpose is to require people to exercise whatever diligence they must to keep refuse out of public waters. Given this aim, we are disinclined to invent defenses beyond those necessary to ensure a defendant constitutional due process. Specifically we reject the existence of any generalized "due care" defense that would allow a polluter to avoid conviction on the ground that he took precautions conforming to industry-wide or commonly accepted standards.[7] See Glenn, The Crime of "Pollution": The Role of Federal Water Pollution Criminal Sanctions, 11 Am.Crim.L.Rev. 835 (1973).

Merely to attempt to formulate, let alone apply, such standards, would be to risk crippling the Refuse Act as an enforcement tool. The defendant, if a substantial business enterprise, would usually have exclusive control of both the expertise and the relevant facts; it would be difficult indeed, and to no purpose, for the government to have to take issue with elaborate factual and theoretical arguments concerning who, why and what went wrong. A municipality may require dog owners to keep their dogs off the public streets, and the court may enforce the ordinance by criminal sanctions without paying attention, except in mitigation, to the owner's tales concerning his difficulty in getting Fido to stay home. In the present circumstances we see no unfairness in predicating liability on actual non-compliance rather than either intentions or best efforts. See O. W. Holmes, The Common Law 49 (1881). Whatever occasional harshness this could entail is offset by the moderateness of the permitted fine, the fact that the statute's command—to keep refuse out of the public waters—scarcely imposes an impossible burden,[8] and the benefit to society of having an easily defined, enforcible standard which inspires performance rather than excuses. The President Coolidge, 101 F.2d 638, 640 (9th Cir. 1939). As a corporate defendant like White Fuel cannot be imprisoned, we need not consider to what extent absolute liability would carry over

7. Nor is due care ordinarily a defense in a civil case premised on strict liability. See generally Epstein, Defenses and Subsequent Pleas in a System of Strict Liability, 3 J. Legal Studies 165 (1974). And under other regulatory laws proof of mens rea is unnecessary and negligence in failing to ascertain the facts that constitute the offense is immaterial. United States v. International Minerals & Chemical Corp., 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971); United States v. DeBartolo, 482 F.2d 312 (1st Cir. 1973). Because a public welfare offense is by its nature one "where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person," Holdridge v. United States, 282 F.2d 302, 309–10 (8th Cir. 1960), strict liability is not unduly harsh.

There is, of course, a long history of strict civil liability in situations comparable to the instant one. See Rylands v. Fletcher, [1868] 3 H.L. 330, and the Restaters' concept of strict liability for "abnormally dangerous" substances, Restatement (Second) of Torts § 519 (Tent.Draft No. 10) (1964). Strict liability for oil spillage has been recommended. See, e. g., Bergman, No Fault Liability for Oil Pollution Damage, 5 J.Maritime L. & Com.Rev. 1 (1973).

8. The Refuse Act makes discharge of refuse illegal only if no permit is obtained. The question whether there are industries which must be allowed to discharge refuse because of their peculiar needs is best left to Congress and the designated agencies. See United States v. Kennebec Log Driving Co., 491 F.2d 562, 568 (1st Cir. 1973), cert. denied, —— U.S. ——, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974).

to cases where incarceration is a real possibility.[9]

■ Although there is no generalized "due care" defense, a defendant may always, of course, show that someone other than himself was responsible for the discharge. White Fuel might, for example, undertake to prove that oil had percolated through its soil from the supply of an adjacent landowner. If a plane crashed into one of its tanks causing a spill, White Fuel would not be liable. If thieves overpowered its watchmen and somehow caused a pipe to overflow, White Fuel would not be liable. Acts of God would be another legitimate defense. It might be a defense that the spill was caused by an independent contractor who was entirely outside the defendant's control. *Cf.* United States v. Georgetown University, 331 F.Supp. 69 (D.D.C.1971). The criminal law does not command the impossible. Sweet v. Parsley, [1969] 2 W.L.R. 470, [1969] All E.R. 347. *See generally* Hughes, Criminal Omissions, 67 Yale L.J. 590 (1958); Hart, The Aims of the Criminal Law, 23 L. & Contemp.Prob. 401, 417–25, 429–36 (1958). In Kilbride v. Lake, [1962] N.Z.L.R. 590, (S.Ct. New Zealand), a driver was convicted of failing to display on his car a current warrant of fitness. It appeared that his warrant had been removed from the car by someone after he had left it. The Court reversed, saying at 591, 593:

> "[A]bsolute liability . . . is essential to put strong pressure on drivers . . . to do their whole duty. . . . [But] it is a cardinal principle that . . . a person cannot be made criminally responsible for an act or omission unless it was done or omitted under circumstances where there was some other course open to him."

*Cf.* Suarez v. Administrator Del Deporte Hipico, 354 F.Supp. 320 (D.P.R.1973),

opinion of three-judge court and declaratory judgment Apr. 25, 1973.

As the above instances illustrate, the law recognizes some defenses even where liability generally is predicated on the sole fact of non-compliance. One is not expected to take all conceivable measures to erect a fail-safe system which would be impregnable to sabotage, thievery, accidental intrusions, the negligence of third parties, and extreme natural disasters. Even if perfect protection could be insured, such is not the "some other course open" of which the law speaks. But, with this caveat concerning human frailty, it remains true that the standard of proof of exculpatory facts is of a much more rigorous and exceptional nature than that of reasonable care. Particularly is this true of an enterprise such as that we deal with here—an oil tank farm, with its inherent risk of spills, leaks, and seepage, abutting navigable waters. Such a high risk enterprise carries with it, even under conventional tort law, a high burden of responsibility.

Against such a requirement for exculpation, White Fuel's proffered defenses, even if proven, were inadequate. White Fuel offered to prove that its personnel did not know of the existence of the oil prior to May 3, 1972 and could not, in any event, have predicted that such oil would seep into the cove. It also wished to show its diligence in cleaning up and checking the seepage once it was discovered. But it was conceded that White Fuel owned the offending oil, that it had occupied the property continuously for years, that the accumulation was vast, and that its property bordered the cove. Given such facts, we do not think that the excluded evidence, even if true, could have demonstrated that it was so far beyond White Fuel's power to have avoided the accumulation and consequent seepage as to render the conviction and fine improper.

Affirmed.

9. *Cf.* Commonwealth v. Koczwara, 397 Pa. 575, 155 A.2d 825 (1959) (approving a fine but holding unconstitutional a jail term for a conviction based upon vicarious liability.)