The UNITED STATES
v.
MACKIN CONSTRUCTION COM-
PANY, INC.
Crim. No. 74–17–G.

United States District Court,
D. Massachusetts.

Jan. 28, 1975.

As Amended Feb. 18, 1975.

Benjamin Jones, Catherine L. Farrell, Boston, Mass., for U. S.

Francis J. Lawler, Peabody, Brown, Rowley & Storey, Boston, Mass., for defendant.

## OPINION

ALDRICH, Senior Circuit Judge.[*]

Mackin Construction Co. was charged in an information in two counts, Count 1 alleging that defendant, being "in charge of onshore facilities within the meaning of 33 U.S.C. § 1321(a)(10), i. e., a tank truck operated for the purpose of delivery of fuel oil and an underground oil storage tank, did fail to notify the appropriate agency of the United States Government of a discharge of oil from such facility in harmful quantities into and upon the navigable waters of the United States and their adjoining shorelines as soon as defendant corporation had knowledge of said discharge; in violation of Title 33, United States Code, Section 1321(b)(5)."

Count II charged that defendant "did unlawfully throw, discharge and deposit,

[*] By designation.

and did cause, suffer and procure to be thrown, discharged and deposited, refuse matter, that is, a large quantity of fuel oil from a storage tank on the shore in Northampton into the Mill River, a tributary of the Connecticut River, a navigable water of the United States, from which tributary such refuse will float and be washed into the Connecticut River, a navigable water; in violation of Title 33, United States Code, Section 407."

*Count 1.*

The circumstances are unusual, and require considerable recitation. At 5:00 a. m. on December 27, 1972, in response to an order for a "tankload," which, from their prior relationship, defendant knew to mean approximately 140 barrels, of No. 6 fuel oil, defendant's tank truck arrived at the business premises of Northampton Cutlery Co. in Northampton, Massachusetts. The driver, following his usual procedure, made a tight coupling to Cutlery's fill pipe. This pipe led into a building which housed a 10,000 gallon tank. He started his pump, and then sat in the truck until the 37 minutes required to complete the pumping had expired. He then emerged and discovered that Cutlery's tank had overflowed through a vent pipe on the roof, and that a large quantity of oil had run down the back side of the building and collected in a depression in the roadway behind, from which it proceeded into Mill River, a short distance away. I find that if the driver had examined the premises he could have observed the entire transit. There being no one around at that hour he left, and telephoned his dispatcher. Defendant made no report to the government.

There is a dispute as to who was responsible for the spill. Cutlery's tank had no gauge or indicator, and the evidence warranted an inference that Cutlery measured incorrectly and ordered prematurely. At the same time, the driver was candid in conceding that sometimes pressure "will build up" and "it [which I take to mean oil] will come

out through the vent pipe . . . . You park the truck so you can see the vent pipe at the top of the building." Evidently he did not see the oil coming out the vent. He could not, from his truck, see behind the building where it accumulated.

■ I find that a driver who delivers oil has a duty to oversee and watch out for normal consequences. It is always conceivable that a customer may over-order, or that something will go wrong. This does not mean he must enter a building where a tank is, but he should watch his own equipment, and the vent. In view of the amount of oil that was discharged in this case, I think it probable that Cutlery overordered. This made Cutlery at fault, but defendant was at fault, too. This does not mean, nor does the fact that I would have found him "in charge" of the coupling had the overflow come from there, that he was in charge of Cutlery's tank. The oil that came from the tank, having been placed there pursuant to Cutlery's order, by any concept of the law of sales had already become Cutlery's. I find that the tank itself was the discharging facility, and that, in spite of defendant's duty of oversight, was not in its charge.

■ I appreciate the government's interest in having an oil spill reported immediately *see* United States General American Transportation Corp., D.N.J., 1973, 367 F.Supp. 1284, 1286, but this interest does not serve to define who was "in charge," or vary the natural meaning of that term. "In charge" is at once broader, and narrower, than the government perhaps conceives. It is broad because it covers the party in charge of the facility even though he had nothing to do with the spill. It is narrower, in that it does not include everyone who participates in the act. I am aware that in the legislative history there is reference to the fact that the person intended to report is the one "operationally responsible for . . . the facility," H.R.Rep. No. 91–127, 91st Cong., 2d Sess. 29 (1970), U.S.Code Cong. & Admin.News 1970, p. 2692. How-

ever, this term, if to be looked to at all, must be read in context with the statutory term "in charge." One having a mere temporary connection is not "operationally responsible" in that sense.

The basic difference is illustrated by the cases of United States v. Gainey, 1965, 380 U.S. 63, 85 S.Ct. 754, 13 L. Ed.2d 658, and United States v. Romano, 1965, 382 U.S. 136, 86 S.Ct. 279, 15 L. Ed.2d 210. In *Gainey* the Court held that a defendant's presence at the scene of an illegal still justified an inference (and hence a statutory presumption), that he was engaged in operating it. However, in *Romano* the Court held that it did not warrant the further inference that he was in possession. I cannot look to legislative history, particularly of a criminal statute, to enlarge to mere contact a phrase that clearly denotes possession and dominion.

*Count II*

■ 33 U.S.C. § 407 is quite different. As I read it it is not concerned with who was in charge, or, even with fault, in the ordinary sense. United States v. American Cyanamid Co., S.D. N.Y., 1973, 354 F.Supp. 1202, aff'd, 2 Cir., 480 F.2d 1132; United States v. United States Steel Corp., N.D.Ind., 1970, 328 F.Supp. 354, aff'd, 7 Cir., 482 F.2d 439, cert. denied, 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147; United States v. Interlake Steel Corp., N.D.Ill., 1969, 297 F.Supp. 912. It is true that in United States v. White Fuel Corp., 1 Cir., 1974, 498 F.2d 619, the court spoke of absence of fault in certain cases, but the court's language and the examples it gave do not, in my opinion, apply where it was at least open to defendant to take precautions and it did not do so. In order that there be no misunderstanding I incorporate herein my findings with respect to fault contained in the part of the opinion initially directed to Count I. Defendant did do an act which caused oil to be deposited in a spot from which it proceeded to the banks of, and hence into, Mill River. It is enough that the line of direct causation was not broken.

*Cf.* United States v. Granite State Packing Co., 1 Cir., 1972, 470 F.2d 303. I find that the land between the tank discharge and the bank of the river was narrow and sloped downwards, and that the river, although not itself navigable water of the United States, was a tributary, leading directly to the Oxbow, itself navigable, and from there into the Connecticut River, obviously so. I further find that some of the spilled oil was at least "liable" to be, and probably was in fact, carried to such navigable water. United States v. American Cyanamid Co., 2 Cir., 1973, 480 F.2d 1132.

My findings in its favor moot defendant's motion for directed verdict on Count I. On Count II that motion is denied, and a finding of guilty will be made.