**UNITED STATES of America**

v.

**GEORGETOWN UNIVERSITY.**

Crim. No. 546–71.

United States District Court,
District of Columbia.

Sept. 2, 1971.

Brian W. Shaughnessy, Asst. U. S. Atty., for the United States.

Brendan V. Sullivan, Jr., Jeremiah Collins, Williams & Connolly, Washington, D. C., for defendant.

OPINION

RICHEY, District Judge.

This case came before the Court in a criminal proceeding pursuant to an indictment returned by the Grand Jury charging the defendant corporation, Georgetown University, with discharging large quantities of No. 6 fuel oil into the Potomac River in violation of the Rivers and Harbors Appropriation Act § 13, 33 U.S.C. § 407 (1964) and 22 D.C.Code § 1703 (1967). The case was tried before the Court without a jury. Upon the consideration of all the evidence adduced at the trial and the Government's brief and memorandum, and the arguments of counsel for the respective parties, the Court concludes as to each count in the indictment that the defendant is not guilty because the Government has failed to carry its burden of proof and for the additional reasons and findings hereinafter set forth.

The Court feels constrained to say that the facts in this case are significantly different from the facts in the cases upon which the Government supported its argument. This decision should not be regarded as a precedent contrary to the decisions of the United States Supreme Court or other federal courts upholding criminal laws imposing strict liability. In other words, this de-

cision is limited to the peculiar facts and circumstances of the instant case.

The Court finds that the following eight essential facts give rise to the inescapable conclusion that the defendant did not on November 13, 1970, which was the date of the alleged oil spill, have sufficient control over the facilities and mechanical apparatus, so as to make them criminally liable under the aforementioned statutes:

(1) Sometime prior to 1969, Georgetown University contracted with Thomas F. Ellerbe, Architects and Engineers of St. Paul, Minnesota, to prepare the specifications and drawings for the design and construction of a heating and cooling plant for Georgetown University in Washington, D. C.

(2) Ellerbe Architects was responsible for inspection, examination and testing of all materials and workmanship and to "reject defective material and workmanship or require its correction" by all trades and contractors working on the construction of this power plant.

(3) The mechanical contractor working under Ellerbe Architects was Erie City Iron Works. Part of the responsibility of Erie City Iron Works was to conduct tests of the oil system in the plant. A test of the oil system of the plant was conducted under the direction of Erie City Iron Works on November 12, 1970, at Georgetown University. It was made pursuant to instructions from Ellerbe, which had previously submitted to Erie City Iron Works on September 23, 1970, a punch list, containing numerous items which had been improperly constructed, installed or adjusted showing that various subcontractors had provided improper materials and workmanship and that many items required correction under their various contracts and the specifications. Moreover, the following colloquy from the Grand Jury testimony of Mr. Henry F. Ohme, Power Plant Supervisor for Georgetown University, placed into evidence by the Government, shows conclusively that the boiler part of the power plant was not only in the control of the contractors on the date of the alleged oil leak, but that the design and construction of the plant was either improper or not fit at that stage for the use and purpose for which it was intended:

"Q. Okay. Now, at 3:00 o'clock in the afternoon of the 12th, did there come a time when there was an attempt made to change to oil heat?

Mr. Ohme. There was.

Q. Who decided to make that attempt?

Mr. Ohme. The boiler contractor's representative.

Q. Why did he want to make that attempt?

Mr. Ohme. It's—it was his—

Q. Why did he want to go on oil?

Mr. Ohme. The contractor was to provide the customer, Georgetown University with an operable boiler that would operate on both fuels. Up to this point the boiler had never been fired on oil or never really fired correctly on oil. So he was attempting to adjust the combustion controls so that it would operate on oil satisfactory to our needs." (Grand Jury Transcript, 13 in evidence as Government's Exhibit #8.)

(4) On November 12, 1970, Mr. Ohme, Georgetown's Plant Supervisor, was ordered and directed by Erie City Iron Works, the mechanical contractor, to turn on one of the pumps to the oil power system in the plant in order to test the system. After it was discovered that there was insufficient pressure, the mechanical contractor ordered Mr. Ohme to start the second pump. On this and the following day the defendant was not in control of the essential components and parts of the plant which are alleged to be the cause of the oil leak.

(5) Neither Mr. Ohme nor his staff had ever been fully instructed in the mechanics of the system. However, several times, under the direction of the mechanical contractor, they were directed to turn on the pump to the oil system.

They also turned the system off, but only when so ordered by the mechanical contractor, and always under the contractor's direction, supervision and control.

(6) On November 12, 1970, the mechanical contractor did not tell Mr. Ohme to turn off the pumps, and the two-way transfer valve, which would have prevented the spill of oil, was not switched on until November 13, 1970, by the mechanical contractor. Because the two-way transfer valve had not been activated, the oil from the two oil storage tanks was being pumped into one tank, eventually resulting in an overflow of oil. This oil then leaked from the cover of a pipe into a sump pit, and finally into the drainage system which flows into the Potomac River.

(7) There was expert testimony that the oil cover used, which had been supplied by the Charles H. Tompkins Company, was not up to ASA standards. These standards require a 20 bolt cover with 20 bolts in place in order to make the system vapor tight. The cover in question had been secured by only ten bolts. Approximately 2,500 gallons of oil escaped through a gap between the cover and the oil tank.

(8) According to testimony from Georgetown's Plant Supervisor and the contractors, Georgetown University had not accepted the new power system as of the date of the incident. The testimony was clear and the Court finds that Georgetown did not and would not accept the new power plant because all items on the punch list were not completed. It was not disclosed whether Georgetown has accepted the system to date or that work on the plant was ever completed.

Having set forth its findings of fact, the Court now turns to a discussion of the principles of law it believes are to be applied in this case.

The Court finds that Thomas F. Ellerbe Architects and Engineers comes within the definition of an independent contractor as set forth in the Restatement (Second) of Agency § 220 (1958):

"(3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent."

Further, Comment b to the above section reads in pertinent part:

"While an agent who contracts to act and who is not a servant is therefore an independent contractor, not all independent contractors are agents. Thus, one who contracts for a stipulated price to build a house for another who reserves no direction over the conduct of the work is an independent contractor; but he is not an agent since he is not a fiduciary, has no power to make the one employing him a party to a transaction, and is subject to no control as to his conduct."

The Court also finds that Erie City Iron Works and Charles H. Tompkins Company fall within the above definition.

Georgetown University is similarly situated to one who contracts with a builder to construct a house, except that here the subject matter is an oil power system. Everything was planned and arranged by the architects, Ellerbe Architects. All tests of the oil power plant were controlled by either Ellerbe or the general contractors, Erie City Iron Works and Charles H. Tompkins Company. The evidence presented at the trial reveals that Georgetown University was not in control at the time of the oil leak. When one of Georgetown's employees turned on the oil pumps at the direction of the mechanical contractor, he became a borrowed servant, and at that point his master was the contractor rather than Georgetown University. *See, e.g.,* Restatement (Second) of Agency § 227 (1958); Ciejek et ux. v. Crane Service Company, 122 U.S.App.D.C. 91, 351 F.2d 788 (1965); Sherwood v. Warner, 27 App.D.C. 64 (1906); Higgins v. West-

ern U. Telegraph Co., 156 N.Y. 75, 50 N.E. 500 (1898).

The facts in Higgins v. Western Union Telegraph Company, *supra*, are analogous to the instant case. In that case the Western Union Company had employed a contractor to make repairs to its building, including the installation of elevators. The elevators were installed, but had not yet been turned over by the contractor, although Western Union used them in carrying passengers, and employed and paid the elevator operators. The plaintiff, a plasterer, in the employ of the contractor, was directed to plaster an elevator shaft, and so he asked the elevator operator to move the car up and down the shaft, carrying the plaintiff on top of it so that he could use the car as a platform. As a result of negligence on the part of the elevator operator, the plaintiff was injured. The trial court held Western Union liable. However, on appeal the court of last resort held that the elevator operator, in performing the service which resulted in the accident, was not acting as the servant of the company which employed and paid him, but was doing the work of the contractor, under the direction of the plaintiff. The D. C. Court of Appeals followed the reasoning of the above decision in Sherwood v. Warner, *supra*. In that case the janitor of a building was asked to assist an elevator repairman who had been called to fix the elevator in the defendant's building. The repairman was subsequently injured as a result of the janitor's negligence in operating the elevator at the repairman's request. In its holding that the owner of the building was not liable for the janitor's negligence, the court considered relevant that the "elevator was in the hands of the [repairman] for repair, and so far as shown, [the owner] had no control over it, and his servants were not engaged in operating it for him, or in their regular line of employment." 27 App.D.C. at 68.

More recently, the United States Court of Appeals for the District of Columbia has established a test to determine the liability of the first employer for an injury to a person or property resulting from his employee's act or omission when the employee is under the direction of an independent contractor. The test is: did the employee fail to exercise the "appropriate degree of care and skill." The first employer is not liable "if the injury was caused, not by any lapse or lack of care by the [employee] in the operation of his crane * * *" and "because the particular utilization ordered and directed by the [independent contractor] was either foolhardy in its original conception or carelessly supervised in its execution." Ciejek et ux. v. Crane Service Company, 122 U.S.App.D.C. 91, 351 F.2d 788, 792 (1965).

Utilizing this test Georgetown University is not liable since the independent contractors knew, and the Court finds as fact from the evidence that Mr. Ohme, the plant supervisor, had not been fully instructed in the operation of the new oil power plant, and further finds that the contractors could not expect him to turn the system off unless specifically ordered to do so. The evidence is clear that Mr. Ohme did not negligently turn on the pumps, and that he did so under the direction of the mechanical contractors. Nor can it be said that Georgetown was responsible for the oil leak because its employee did not turn the pumps off or switch on the two-way transfer valve, since he was not instructed about the probable consequences of leaving the pumps on without turning on the two-way transfer valve. The Court concludes that Georgetown's employee acted under direction of an independent contractor who retained absolute control of the power system at the time of the oil leak.

The Court has carefully examined the cases cited by the Government in its Trial Memorandum and Memorandum on Control. The Court believes that it can distinguish all of those cases from the present case on the ground that the various defendants had direct control over their individual operations. For example, in Holden v. United States, 24 App.

D.C. 318 (1904), cert. denied, 196 U.S. 639, 25 S.Ct. 796, 49 L.Ed. 631 (1905), the gaslight company knew that gas and oil were flowing into the Potomac and admitted that they had direct control. Their sole defense was that the spillage was necessary in order to supply gas power to the City of Washington. In Brennan Construction Company v. Cumberland, 29 App.D.C. 554 (1907), the court held Brennan liable because they had placed the oil storage tanks in a precarious position on the banks of the Potomac River, approximately 200 feet from the water. Once again, Brennan had direct control at the time the oil spilled into the river. Finally, in United States v. Standard Oil Co., 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966), Standard Oil was in direct control of the shut-off valve at the dockside which had been left open accidentally.

The Court is fully aware that the purpose of the relevant statutes in the case at bar is to minimize possible injury to persons and property. Accordingly, specific intent to violate them is not required. The Court believes there can be no violation unless the defendant is in a position to prevent such damage. There can and should not be any indictment where, as here, the laudatory purpose of a strict liability statute and the public policy is not served by charging a university with a criminal offense under circumstances where they did everything a reasonably prudent person could have or might reasonably be expected to have done. The evidence indicates that the defendant did nothing more than contract to pay an independent contractor to erect a power plant facility, so as to enable them to carry out the basic Congressional mandate contained in their Charter, namely, to provide an education for its students.

In cases like the one here involving strict liability, while not requiring the usual element of criminal intent, they do necessitate some element of control by those indicted. In the instant case, control is lacking, and to find guilt here would require the elimination of the common sense intendment of the statutes here involved. When one is not in control of facilities which lead to a violation of statutes like those in the case at bar, the ultimate result or damage to persons or property should be examined in the light of the Congressional policy to impose strict liability upon only those corporations or individuals who have it peculiarly within their power through the exercise of due diligence to protect the public. To stretch the instant statutes to their logical extreme would be to allow the Government to criminally indict even the most unrelated persons and business entities instead of the real perpetrator.

Based on the preceding findings of fact and conclusions of law, the Court finds Georgetown University not guilty of violating 33 U.S.C. § 407 (1964) and not guilty of violating 22 D.C.Code § 1703 (1967).