151 N.J. Super. 464 (1977)
376 A.2d 1339
THE STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, PLAINTIFF,
v.
EXXON CORPORATION AND ICI AMERICA, INC., CORPORATIONS REGISTERED TO DO BUSINESS IN NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided June 15, 1977.
*468 Mr. Ronald P. Heksch, Deputy Attorney General, for the State of New Jersey (Mr. William F. Hyland, Attorney General of New Jersey, attorney).
Mr. Clyde A. Szuch for ICI America, Inc. (Messrs. Pitney, Hardin & Kipp, attorneys).
KENTZ, J.S.C.
The State of New Jersey, Department of Environmental Protection (herein the State), brought an action against Exxon Corporation and ICI America, Inc. (ICI). The State's complaint alleges that defendants violated N.J.S.A. 58:10-23.1 et seq. (sometimes herein, the act) and N.J.S.A. 23:5-28, and further created and/or continued to maintain a public nuisance. Subsequently, the State abandoned its claim under N.J.S.A. 23:5-28.
As to defendant ICI, the State seeks injunctive relief requiring to cease and correct the emanation of petroleum *469 products from its property at Constable Hook in Bayonne, New Jersey.
With regard to defendant Exxon, a stipulation of dismissal was previously filed with this court which requires that Exxon remedy the petroleum pollution problems which exist on its property at the Constable Hook section of Bayonne.
The State now seeks a summary judgment against ICI requiring it to cease and correct the emanation of petroleum products from its property, and ICI seeks a summary judgment against the State for a dismissal of the complaint.
For the purpose of bringing these cross-motions for summary judgment, the parties have entered into and filed a stipulation of facts which reads as follows:
1. Since 1898 Exxon and its predecessors in interest (hereinafter referred to as "Exxon") have owned a large tract of land (hereinafter the "Exxon property") in the Constable Hook section of the City of Bayonne.
2. Between 1965 and 1969 Exxon sold to ICI Organics Inc., the predecessor of ICI United States, Inc., in four separate transactions 34.95 acres of land (hereinafter the "ICI property"), retaining the bulk of the Exxon property for Exxon's continuing use.
3. Prior to the acquisition by ICI, Exxon had for about 70 years employed the Exxon property for refining, storing and transshipping of crude oil and refined petroleum products of the type in this issue in this case (hereinafter "oil").
4. Exxon continues to the present to employ 282.48 acres which it retained as a storage and transfer facility for oil.
5. During the course of their refining, storing and transfer operations, Exxon spilled, permitted to leak and intentionally discharged massive quantities of oil on and into the ground of the Exxon property, including that portion which is now the ICI property.
6. Other areas of Constable Hook have been similarly used by various owners for long periods of time for the storage, refining and transshipping of oil. These other users, in a manner similar to Exxon, discharged, spilled, and leaked massive quantities of oil on and into the lands of Constable Hook.
7. Because of the historic use of the Constable Hook area by the landowners for the refining, storage and distribution of oil, the soil to a considerable depth and the groundwaters of that area were seriously contaminated with oil long before ICI acquired its property.
*470 8. The forces of nature, principally the rise, fall and lateral drainage movement of the subsurface groundwater, cause the oil in the soil to rise, fall and flow with the subsurface groundwater, with the result that oil migrates through, over and under large areas of Constable Hook, including the properties of Exxon, the City of Bayonne, the Lehigh Valley Railroad, ICI and many others. As a consequence, oil from these properties as well as from the ICI property reaches and enters the waters of the State of New Jersey in issue in this case.
9. The saturation of the Constable Hook area, including the ICI property, is extensive both in surface area and subsurface depth and has manifested itself in many forms, including heavy accumulations of oil in the storm water drainage systems serving Constable Hook.
10. The oil strata underlying the ICI property includes both crude oil and refined petroleum product, ranges in thickness from 7 to 18 feet, commences at various depths from 2 to 13 feet below the surface, and contains an estimated 7 million gallons of oil.
11. Since acquiring the property, ICI has conducted a manufacturing operation on the site which does not involve the utilization, storage, handling or transfer of oil, and ICI has never engaged in any activity which added oil to the condition which existed at the time the ICI property was purchased from Exxon.
The pleadings, the affidavits and the stipulation of facts indicate that there is no genuine issue of material fact. Therefore, the matter is ripe for summary judgment. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954).

I
ICI seeks a summary judgment on the ground that it has not committed any act causing a discharge of oil which is proscribed by N.J.S.A. 58:10-23.1 et seq. The State admits that this statute requires an act but contends that ICI has committed the very act which would fall within the proscription. Therefore, the threshold questions are what kind of an act is proscribed by N.J.S.A. 58:10-23.1 et seq., and whether ICI has committed such an act so as to be brought within the proscription.
*471 Admittedly, the plain language of the statute requires an act by the wrongdoer[1]. The act of "discharge" is defined in N.J.S.A. 58:10-23.3 as follows:
c. "Discharge" shall mean, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping.
These verbs connote some activity, some human agency, even if that activity is accidental or unintentional. For example, the verb "leak" is defined as follows: "to enter or escape through a hole, crevice, or other opening usually by a fault or mistake." Similarly, "spill" means "to cause or allow to pour, splash, or fall out (as over the edge of a container) and be washed, lost or scattered." The verb "pump" denotes "to pour forth, eject, deliver force, or draw in the manner of a pump or one using a pump." Webster's Third New International Dictionary (1961).
The State argues that N.J.S.A. 58:10-23.3(c) is not limited to the verbs used in that section and that synonyms such as "exude" and "ooze" can be used for the verb "emitting." It maintains that the statute is not limited to activity set in motion by human behavior. The State contends that the Legislature intended to prohibit all activity and inactivity that would result in petroleum products finding their way into the waters of the State. Thus, the State asserts that in the present case the oil in question is exuding, oozing and/or being emitted from land owned and controlled by ICI and entering the waters of the State.
The court finds the State's reading of the statute to be erroneous. Although the term "discharge" in the statute is not limited in definition, one may not properly seek to expand the definition of discharge by employing words outside of the class of words specifically set forth *472 in the statute. The meaning of the words may be indicated or controlled by those with which they are associated. It is a fundamental rule of construction that associated words explain and limit each other. 2A Sutherland Statutory Construction (4 Ed. 1973), § 47.16 at 101. "The meaning of a doubtful word or phrase in a statute may be ascertained by a consideration of the company in which it is found and the meaning of the words which are associated with it." Boileau v. DeCecco, 125 N.J. Super. 263, 267 (App. Div. 1973), aff'd 65 N.J. 234 (1974). See also, Germann v. Matriss, 55 N.J. 193 (1970).
The specific words set forth in the statute to define "discharge" are transitive verbs expressing an action that carries from an agent or subject to an object. It follows that any term which would be added to those already specifically included in the statutory definition would have to be of the same class and must therefore refer to human activity.
Reinforcement of this conclusion is found in the overall statutory scheme which provides that the "person responsible for discharging ... shall immediately undertake to remove such discharge," N.J.S.A. 58:10-23.5, and imposes liability for the costs of such removal upon the person responsible for having discharged petroleum products. N.J.S.A. 58:10-23.7. Responsibility is the obligation to answer for an act done and to repair any injury a party might have caused. Thorgaard Plumbing & Heating Co. v. King Cty., 71 Wash.2d 126, 426 P.2d 828, 835 (Sup. Ct. 1967).
As the stipulated facts indicate, ICI has not "discharged" within the meaning of the statute. Many years prior to ICI acquiring the property in question oil had been placed onto and into this land. The escape of that oil occurs without the intervention of ICI and has been ongoing for many years. ICI has not changed the situation as it may have existed at the time of its acquisition of this property.
*473 The State next contends that simple ownership of land, without any affirmative act, is sufficient to assess liability against ICI in that it owns the land and is permitting oil therefrom to empty into the waters of the State. The State relies on Lansco, Inc. v. Dept. of Environmental Protection, 138 N.J. Super. 275 (Ch. 1975), aff'd 145 N.J. Super. 433 (App. Div. 1976). In that case the court concluded that a company that leased premises for the purpose of storing asphaltic oil would be liable under N.J.S.A. 58: 10-23.1 et seq. when unknown persons opened the valves of two storage tanks which resulted in a 14,000-gallon oil spill.
The court in Lansco, supra, at 286, after considering the legislative history of the act, found that the legislative intent was to impose responsibility for removal of an oil spill on the person from whose property the oil was discharged. The Lansco case is factually distinguishable. Unlike the present case, the facts in Lansco established a classic case for imposing strict liability based on the concept of enterprise liability. Defendant in Lansco was in the business of storing asphaltic oil. It brought the oil onto its leased land for economic gain, thereby assuming the risks inherent in such an enterprise. It quite properly carried insurance to cover the risk of oil spills. As lessee it controlled the premises at the time oil spilled from its tanks. The spill occurred after the statute was in effect. Without its operations as an oil storage facility the spill would have been avoided. On the other hand, ICI never assumed the risk of handling enormous quantities of crude oil and should not be saddled with the liabilities which properly attach to such an enterprise. ICI did not own or control the property when the oil was discharged onto the land. While defendant in Lansco might have hired a night watchman or constructed a better fence, ICI was never in a position to monitor the spilling or leaking of oil which occurred before the acquisition of the property. If ICI had never bought the land, oil would still be seeping into state waters. At the time of purchase *474 the act did not exist and ICI had no way to foresee the problems which would arise therefrom.
The facts here demonstrate that the imposition of strict liability upon ICI under the act based on the enterprise theory is inappropriate. As succinctly stated by Dean Prosser:
The basis of the liability is the defendant's intentional behavior in exposing those in his vicinity to such a risk. The courts have tended to lay stress upon the fact that the defendant is acting for his own purposes, and is seeking a benefit or a profit of his own from such activities, and that he is in a better position to administer the unusual risk by passing it on to the public than is the innocent victim. The problem is dealt with as one of allocating a more or less inevitable loss to be charged against a complex and dangerous civilization, and liability is imposed upon the party best able to shoulder it. The defendant is held liable merely because, as a matter of social adjustment, the conclusion is that the responsibility should be his. [Prosser, Torts (4th Ed. 1971), § 75 at 494-95]
The rationale for imposing strict liability is clearly inapplicable to the present case. The rule of liability without fault has no appropriate application to ICI under the facts here because ICI did not bring the oil onto or into its property. It did not knowingly permit the oil to accumulate and did nothing to encourage or contribute to oil being stored up there. See Zampos v. United States Smelting, etc., Co., 206 F.2d 171 (10 Cir.1953).
Not only is ICI free of violating N.J.S.A. 58:10-23.1 et seq. because it did not commit an act within the meaning of the statute but the State has failed to establish that any act by ICI caused the water pollution. It contends that the act eliminates the causation requirement. I disaagree. Such a position would be inconsistent with the recent decision of our Supreme Court in State v. Jersey Central Power & Light Co., 69 N.J. 102 (1976). In that case, in absolving Jersey Central of liability under N.J.S.A. 23:5-28, the court found that cause-in-fact was an essential element under the statute there involved. The court, quoting *475 from "The Proximate Consequences of an Act," 33 Harv. L. Rev. 632 (1920), said:
* * * if the result would have happened just as it did whether the alleged actor had done his duty or not the failure to perform the duty was not a factor in the result, or, in other words, did not cause it. [at 638]
The philosophy, purpose and prohibitions of N.J.S.A. 23:5-28 are identical to those of N.J.S.A. 58:10-23.1 et seq., since the two statutes were enacted at the same time as part of the Water Quality Improvement Act. The two statutes must therefore be read and construed in pari materia. Accordingly, the court's determination in Jersey Central Power & Light Co. that causation is a necessary element to a finding of liability under N.J.S.A. 23:5-28 is equally applicable to a finding of liability under N.J.S.A. 58:10-23.1 et seq. Mimkon v. Ford, 66 N.J. 426 (1975).
In supporting its contentions that there is no causal relations between any of ICI acts and the discharge of the petroleum, ICI relies on several federal cases wherein defendants, similar to ICI, were permitted to interpose a defense that third parties beyond their control had caused the damage. See United States v. Georgetown Univ., 331 F. Supp. 69 (D.D.C. 1971); see also, United States v. White Fuel Corp., 498 F.2d 619 (1 Cir.1974). The State argues that these cases are inapplicable to the situation here in that they dealt with criminal statutes requiring a different burden of proof than the statute in question. Furthermore, the State points out that under federal law the defense of third-party intervention has been available to persons charged thereunder and that this general rule was codified by Congress when it enacted the Federal Pollution Control Amendments of 1972, 33 U.S.C.A. § 1251 et seq.[2] The State also points *476 out that the legislative history of N.J.S.A. 58:10-23.1 et seq. indicates that the Legislature was aware of this fact, was asked to amend the act to make it conform to federal law, and refuse to do so.[3]
The court does not find the State's reliance on the legislative history persuasive. Since there was no recognition by the legislators that the assumed interpretation was correct, this history should be rejected. 2A Sutherland, Statutory Construction (4th Ed. 1973), § 48.10 at 210. Furthermore, "the imputed intent of any single member, or even of a minority bloc, of the legislature has no significance in judicial construction." Flagg v. Johansen, 124 N.J.L. 456 (Sup. Ct. 1940); Cicchino v. Biarsky, 26 N.J. Misc. 300 (D.Ct. 1948). In the instant case only two senators were present at the committee hearing, and there is no evidence that any others considered the proposals.
Furthermore, the State's argument that ICI is within the purview of the statute because it is not within one of the stated statutory exemptions is fallacious. ICI cannot be held liable under the act simply because it does not come *477 within the enumerated exemptions, without a showing that ICI violated N.J.S.A. 58:10-23.1 et seq. This is precisely the issue before the court, i.e., whether ICI committed any act which caused or causes the resultant harm.
The court is of the opinion that the federal cases relied on by ICI are applicable to the issue of causation. In United States v. Georgetown Univ., supra at 73, before the federal exemption of third-party intervention was codified, the court, in construing the Rivers and Harbors Appropriation Act, 33 U.S.C.A. § 407 (1964)[4] to be a strict liability statute, held that where defendant owner was not in a position to prevent the oil spill or damage, it could not be held liable. On the question of causation the court stated:
To stretch the instant statutes to their logical extreme would be to allow the Government to criminally indict even the most unrelated persons and business entities instead of the real perpetrator. [331 F. Supp. at 73]
Similarly, the court in U.S. v. White Fuel Corp., supra explained the allowability of possible defenses within the ramifications of causation under a strict liability statute as follows:
Although there is no generalized "due care" defense, a defendant may always, of course, show that someone other than himself was responsible for the discharge. White Fuel might, for example, undertake to prove that oil had percolated through its soil from the supply of an adjacent landowner. If a plane crashed into one of its tanks causing a spill, White Fuel would not be liable. If thieves overpowered its watchmen and somehow caused a pipe to overflow, White Fuel would not be liable. Acts of God would be another legitimate defense. It might be a defense that the spill was caused by an independent contractor who was entirely outside the defendant's control. [498 F.2d at 624]
Under the circumstances of this case it appears that causation cannot be shown between any act of ICI and the *478 resultant harm. ICI acquired its property between 1965 and 1969. By then almost seven decades had gone by under Exxon's ownership in which the land was despoiled by spillage of oil by Exxon. These acts so contaminated the ground that some 7,000,000 gallons of oil today lie under the surface of the 35 acres purchased by ICI. However, ICI had no control over the land while the oil was being deposited thereon by Exxon and thus could not have prevented it. Therefore, no causal relation can be found between ICI's acts and the oil originally deposited on the land by Exxon and now seeping into the waters of the State.
Although ICI does not come within any of the enumerated exemptions in the act it nevertheless cannot be held liable under the act since the circumstances here indicate that ICI has not committed any act within the meaning of the statute which has caused the complained of harm. Consequently, without a showing of an act and causation ICI cannot be held strictly liable under N.J.S.A. 58:10-23.1 et seq.
In passing, the court notes that while the decision in this case was pending, the New Jersey Legislature repealed N.J.S.A. 58:10-23.1 et seq. under which this action was brought and replaced it with the Spill Compensation and Control Act. L. 1976, C. 141 (the Spill Act). In using the Spill Act merely as a guide[5] in interpreting the legislative *479 intent, the court notes that the Spill Act demonstrates important policy considerations which are in complete harmony with this court's holding that no liability should fall upon a party in the position of ICI. In making the statutory changes the Legislature has clarified those aspects of the prior statutory scheme which are in issue here. Specifically, the term "discharge" is now defined in § 3h as "any intentional or unintentional action or omission resulting in the releasing * * *" (Emphasis supplied). The language of the Spill Act makes it obvious that the Legislature intended an act and a causative nexus to be present between the discharger and the discharge. Secondly, § 8(d) of the Spill Act provides that acts or omissions of a third party provide a complete defense for an owner or operator of a major facility.[6] If an owner or operator of a major facility[7] has a third-party defense available under the specific language of the statute, then it is inconceivable that an entity such as ICI would be precluded from that defense. Therefore, the term "any defense available under statutory law" must be interpreted as providing the third-party defense to parties such as ICI. In addition, this section incorporates by reference all common law defenses. It is apparent that under the Spill Act a party such as ICI would have available to it either by way of a defense or on the issue of causation the opportunity to show *480 that a third party was responsible for the discharge. Thus, the Spill Act sheds some light on the policy considerations that govern holding a discharger liable under a strict liability statute.[8] Accordingly, this court's interpretation of N.J.S.A. 58:10-23.1 et seq. as a strict liability statute as it applies to ICI is completely consistent therewith.

II
Assuming, arguendo, that ICI's position in this case makes it liable within the literal terms of N.J.S.A. 58:10-23.1 et seq., then the application of said statute to ICI is barred because it cannot be applied retroactively.
N.J.S.A. 58:10-23.1 et seq. was enacted in 1971. Prior to this enactment the only governing statute was N.J.S.A. 23:5-28 which had been specifically interpreted to exclude accidental spills. Exxon owned the property prior to ICI's acquisition. It was Exxon that was responsible for the spillage of large quantities of oil on and into the lands of the Constable Hook. ICI purchased the property in question from Exxon between 1965 and 1969 and certainly could not have foreseen at that time that its ownership would carry such an enormous burden as the cleanup of the oil pool beneath its property.
Under the present circumstances it appears that the State is seeking to apply the act retroactively. The statute provides two alternative prohibitions: discharge directly "into * * * the waters of [the] state" and "discharge * * * in a manner which allows flow or runoff into or upon the waters of [the] State." N.J.S.A. 58:10-23.4. The first alternative applies to direct discharges such as from sewers and vessels, whereas the second type of prohibited activity is the placing of material *481 in such a location as to give it the opportunity to flow into the waters of the State. The "discharge" in this case is of the second type and occurred when Exxon caused the spillage and dumping into the ground in a manner which allowed for its eventual flow or runoff into the State's waters. Accordingly, any activity which could have constituted a violation of the statute was completed prior to ICI's acquisition of this property. It is stipulated that ICI has done nothing to add to the flow or runoff of the oil into the State's waters. Therefore, since the "discharge" ceased before the Act was enacted, the application of this statute to ICI would be impermissibly retroactive.
The courts of New Jersey are reluctant to apply statutes retroactively. As the court said in Rothman v. Rothman, 65 N.J. 219 (1974):
[I]n construing a statute its terms will not be given retroactive effect "unless they are so clear, strong and imperative that no other meaning can be annexed to them, or unless the intent of the legislature cannot otherwise be satisfied." Kopczynski v. County of Camden, 2 N.J. 419, 424 (1949). See also, La Parre v. Y.M.C.A. of the Oranges, 30 N.J. 225, 229 (1959); In re Glen Rock, 25 N.J. 241, 249 (1957); Nichols v. Board of Education, Jersey City, 9 N.J. 241, 248 (1952). [at 224]
There is no language in N.J.S.A. 58:10-23.1, et seq. which would indicate that the Legislature intended the statute to be applied retroactively. The prohibition in N.J.S.A. 58:10-23.5 is stated in the present tense as it applies to "any person responsible for discharging petroleum products, debris or hazardous substances." Clearly, the statute cannot be applied to past behavior or conduct.
Other jurisdictions have refused to apply this type of statute retroactively. In Maryland, Dept. of N. Res. v. Amerada Hess Corp., 350 F. Supp. 1060 (D. Md. 1972), the state did not prevail under the Maryland statute imposing liability for oil spills because the spill in question occurred before the enactment of the statute. The court refused to apply the *482 statute retroactively quoting from Bell v. State, 236 Md. 356, 369, 204 A.2d 54, 61 (1964) as follows:
"The general presumption is that all statutes, state and federal, are intended to operate prospectively and the presumption is found to have been rebutted only if there are clear expressions in the statute to the contrary. Retroactivity, even where permissible, is not favored and is not found, except upon the plainest mandate in the act." [at 1069-70.]
The facts of this case compel a determination that N.J.S.A. 58:10-23.1 et seq. cannot be applied to ICI retroactively. In the absence of a clear statutory requirement, this court cannot enforce the act against ICI. To do so would be a retroactive application of a statute and would place the enormous burden of abating a condition created by a third party on the shoulders of a party innocent of any wrongdoing.

III
As an alternative basis for liability, the State alleges that ICI is liable for maintaining a public nuisance on its property. The State contends that ICI is guilty of maintaining a public nuisance as a matter of law by violating N.J.S.A. 58:10-23.1 et seq. It is well established that the Legislature may prescribe by statute what shall constitute a nuisance without formally declaring that such is a nuisance. 66 C.J.S. Nuisances § 7 (1950); 58 Am. Jur.2d, Nuisances, § 17 (1971). However, in view of this court's prior determinations that ICI is not liable under the terms of the act and that it cannot be applied retroactively to ICI, it is unnecessary at this time to decide whether the statute creates a public nuisance as a matter of law.
The State next urges that ICI is maintaining a common law nuisance. In order to establish that a nuisance exists under common law, it must be shown that "there has been an unreasonable, unwarranted or unlawful use by a person of his real property which is resulting in a material annoyance, inconvenience or hurt." Cherry Hill Tp. v. N.J. Racing *483 Comm'n, 131 N.J. Super. 125 (Law Div. 1974), aff'd 131 N.J. Super. 482 (App. Div. 1974), certif. den. 68 N.J. 135 (1975).
Under the facts here, ICI is not maintaining a nuisance because the requisite elements of a nuisance have not been established. The court is not persuaded that ICI is engaging in an activity or use of its land which is unreasonable, unwarranted or unlawful. It may have been unreasonable for Exxon to dump millions of gallons of oil onto and into the ground, and it may have been unreasonable for the State to allow this practice for over 70 years, but it is not unreasonable for ICI to use the land for manufacturing in an industrial area.
Additionally, the State has failed to show some basis for imposing liability on ICI for maintaining a nuisance. As stated by Dean Prosser:
Today liability for nuisance may rest upon intentional invasion of the plaintiff's interests, or a negligent one, or conduct which is abnormal and out of place in its surroundings, and so falls fairly within the principle of strict liability. With very rare exceptions, there is no liability unless the case can be fitted into one of these familiar categories. [Prosser, Torts, (4th Ed. 1971), § 87 at 574]
It appears that liability for nuisance must be premised upon a showing that the conduct in question was intentional or negligent, or that it came within the principle of strict liability.
Since the State makes no contention that ICI has committed any intentional wrong, intent cannot be the basis for liability.
ICI has not been negligent in its use of the land because it has not caused the condition in issue. State v. Jersey Central Power & Light Co., supra.[9] A person is not civilly liable for a nuisance caused or promoted by others over whom he has no control and such person is not bound *484 to incur the expense to abate such a nuisance. 58 Am. Jur.2d, Nuisances, § 24 (1971); 66 C.J.S. Nuisances § 8b (1950); Tennessee Coal, Iron & R. Co. v. Hartline, 244 Ala. 116, 11 So.2d 833 (Sup. Ct. 1943). Consistent with this principle of law, ICI is not liable for a nuisance on the theory of negligence. The pollution condition here was created by an independent third party, i.e., Exxon, over whom ICI had no control. Exxon's acts are the proximate cause of the pollution and therefore it would be inconsistent with justice or propriety that ICI should be held to responsibility. State v. Rankin, 3 S.C. 438, 16 Am. R. 737 (Sup. Ct. 1872).
New Jersey law is unclear in defining the scope of strict liability as applied to the use of land. The terms "nuisance per se," "ultra-hazardous" and "inherently dangerous" have not been clearly or consistently defined. Majestic Realty Associates, Inc. v. Toti Contracting Co., 30 N.J. 425 (1959). The storage of gasoline has never been classified as "ultrahazardous." Morrison v. Standard Oil Co. of N.J., 105 N.J. Eq. 104 (Ch. Div. 1929), aff'd 106 N.J. Eq. 281 (E. & A. 1930); Sarno v. Gulf Refining Co., 99 N.J.L. 340 (Sup. Ct. 1923), aff'd 102 N.J.L. 223 (E. & A. 1925).
For the reasons stated earlier, the imposition upon ICI of strict liability is inappropriate in this context. The rationale behind strict liability, i.e., that an enterprise involving unusual hazards must pay its way, is not applicable to ICI. ICI is not now and never has been in the business of storing oil or doing anything connected with oil. Exxon, not ICI, discharged oil onto and into the ground when it owned the property. Therefore, ICI should not bear the burden of paying for the consequences of the activities of its predecessor in title.
The State argues that ICI is chargeable with maintaining a nuisance because after acquiring the subject property it learned of the existence of the nuisance and it has done nothing to remedy it. The State contends that ICI's *485 inaction as an owner of the land is unreasonable. It is evident that the State is attempting to impose liability in nuisance based solely upon ICI's ownership of the property. However, mere ownership of property without anything more cannot and should not be the determinative factor in imposing liability under the circumstances here.
It is the general rule that the creator of a nuisance remains liable even after alienating his property. Garvey v. Public Service etc., Co., 115 N.J.L. 280, 284 (E. & A. 1935). In State v. Ole Olsen, Ltd., 38 A.D.2d 967, 331 N.Y.S.2d 761 (App. Div. 1972), it was held that where homes which contained a nuisance had been sold by the creators of the nuisance, the transfer of title did not preclude the creators from being directed to remedy the condition. Similarly, ICI should not be compelled to bear the burden of abating the condition created by its predecessor in title. Exxon, which admittedly was the owner of the property and which was responsible for creating the pollution is available and is a party to this action. The State could have sought to have Exxon directed to remedy the condition with the cooperation of ICI. However, the State chose to forego its remedy against Exxon, and the court will not question the wisdom of its choice. Nevertheless, this court of equity cannot and will not place the burden on ICI of abating a condition which it neither created nor contributed to, on the mere basis of ownership. In this industrial age ownership has no more relationship to the problems of pollution than did the theory of privity of contract to the problems of products liability. As the privity of contract theory prevented just results and enabled the party responsible for defects in products to escape liability, so would blind adherence to a theory making every landowner liable for pollution on his land regardless of the source of that pollution. It would be inequitable, if not a travesty of justice to impose on ICI the burden of abating the pollution condition solely on the theory of ownership.

*486 Conclusion

I find that ICI did not violate N.J.S.A. 58:10-23.1 et seq., nor did it create or continue to maintain a nuisance as charged. The complaint against ICI is dismissed.
NOTES
[1] N.J.S.A. 58:10-23.4 prohibits the "discharge of * * * petroleum products into, or in a manner which allows flow or run off into or upon the waters of this State and the banks or shores of said waters * * *."
[2] See, 33 U.S.C.A. § 1321(f)(2) and 33 U.S.C.A. § 1161(f) (2) (D).
[3] The State contends that the legislative intent to exempt dischargers from liability under the act only in cases where the discharge is a result of an act of war or God is not only borne out by the language of the act but also by its legislative history. Twice during the Senate Committee Hearings on Senate Bill 928 (which ultimately became the statute at issue herein) requests were made to expand the exceptions under N.J.S.A. 58:10-23.10. William Land, manager of Environmental Protection, Union Carbide Corporation, and chairman of New Jersey's Chamber of Commerce Water Pollution Control Committee, suggested that "the two noted exceptions [acts of war or God] relating to liability be expanded to include riot, sabotage and vandalism." New Jersey Public Hearing before Senate Committee on Air and Water Pollution and Public Health, at 51. In addition, Leonard Ruppert, executive Director of the New Jersey Petroleum Council, appearing before the same Committee, recommended that the exceptions include "an act or omission of a third party * * *." This, he argued, would be consistent with Federal statutes in this area. Id. at 61. Nevertheless, these suggested exceptions were not included under N.J.S.A. 58:10-23.10.
[4] This act is the federal criminal counterpart of N.J.S.A. 58:10-23.1 et seq.
[5] ICI contends that this action is now governed completely by the Spill Act. The court finds this contention without merit for several reasons. While there is no savings clause in the act itself, New Jersey does have general savings statutes, N.J.S.A. 1:1-11 and N.J.S.A. 1:1-14 which preserve the rights vested in the State under N.J.S.A. 58:10-23.1 et seq. These statutes indicate that rights created by statute such as the State's right under N.J.S.A. 58:10-23.1 et seq. to abate water pollution allegedly caused by ICI, are not affected by its repeal. Litigation commenced prior to repeal should not be terminated until the matter is prosecuted to a final adjudication even where there is no specific savings clause. Margaritell v. Caldwell Tp., 58 N.J. Super. 251, 260 (Ch. Div. 1959), aff'd 33 N.J. 453 (1960); Hunt v. Gulick, 9 N.J.L. 205, 207 (Sup. Ct. 1827).
[6] Section 8(d) provides:

An act or omission caused solely by war, sabotage, governmental negligence, God, or a third party or a combination thereof shall be the only defenses which may be raised by any owner or operator of a major facility or vessel responsible for a discharge in any action arising under the provisions of this act. For the purposes of this act, no employee or agent of such owner or operator shall be considered as a third party. Any other person shall have available to him any defense authorized by common or statutory law. [Emphasis supplied]
[7] Sections 3(k) and 3(m) of the new act define an "owner or operator of a major facility" as one who refines, produces, stores, handles, transfers, proceases or transports hazardous substances and has a storage capacity of 400,000 gallons of hazardous substances.
[8] The Spill Act is clearly a strict liability statute for § 8(c) reads: "Any person who has discharged a hazardous substance shall be strictly liable, without regard to fault, for all cleanup and removal costs." (Emphasis supplied)
[9] See I of this opinion for a discussion of causation.