**HEIBY OIL COMPANY, INC., Appellee,**

v.

**SCHREGARDUS, Dir., Appellant.**

[Cite as *Heiby Oil Co., Inc. v. Schregardus* (1993), 92 Ohio App.3d 46.]

Court of Appeals of Ohio,
Franklin County.

No. 93AP–363.

Decided Dec. 2, 1993.

*Kelly & Traul* and *Howard A. Traul II; Samuels & Northrop Co., L.P.A.,* and *David E. Northrop,* for appellee.

*Lee Fisher,* Attorney General, *Jack A. Van Kley* and *Lori A. Massey,* Assistant Attorneys General, for appellant.

PEGGY L. BRYANT, Presiding Judge.

Appellant, Donald R. Schregardus, Director of the Ohio Environmental Protection Agency ("director"), appeals from a decision of the Ohio Environmental Board of Review ("EBR") finding that the director's order requiring appellee, Heiby Oil Company, Inc. ("Heiby"), to "clean up" its gasoline spill is unlawful for lack of statutory authority.

Heiby owns and operates a bulk petroleum storage facility in Bellefontaine, Ohio. The facility has six above-ground petroleum storage tanks and is located approximately one-half mile from a residential area which relies upon private wells for its drinking water. The facility is also located approximately one quarter mile from the city of Bellefontaine's water well field.

On March 19, 1987, ten thousand gallons of unleaded gasoline leaked from one of the above-ground storage tanks at the Heiby facility and spilled onto the ground. Although a system of concrete dikes was in place to contain a gasoline leak, the system failed; the gasoline soaked into the surrounding soil and slowly began seeping into the groundwater.

On March 21, 1987, Heiby reported the gasoline spill to the Ohio Environmental Protection Agency ("OEPA"). Fearing possible groundwater contamination, OEPA requested that the city of Bellefontaine voluntarily place its well nearest the spill site out of service until further notice. OEPA instructed Heiby to install two containment trenches behind the concrete dikes to capture the gasoline to prevent its entering the groundwater. Though Heiby installed the trenches, they proved ineffective, as the gasoline had already infiltrated the soil to a point beyond where the trenches were dug.

At OEPA's request, Heiby hired an environmental consultant to investigate the gasoline spill and to prepare a plan to prevent or reduce the groundwater pollution resulting therefrom. Heiby hired Twin City Testing ("TCT"), whose investigation revealed the presence of gasoline in each of ten groundwater monitoring wells which it dug, as well as a high level of soil contamination in the area. TCT installed a system to recover the gasoline floating on top of the groundwater. Nonetheless, more than two years later only two hundred of the ten thousand gallons of gasoline spilled at the Heiby site had been recovered.

Beginning in May 1989, OEPA began to discover that much of the work which TCT represented to OEPA as completed had not been performed. During the same period, OEPA also learned that the recovery system installed by TCT had not been operating since at least January 1989. On July 20, 1989, OEPA notified Heiby of its discoveries and expressed its concern about the slow rate at which the gasoline recovery was progressing.

Thereafter, Heiby twice changed environmental consultants, replacing TCT with Tank Tec Resources in August 1989, and replacing Tank Tec Resources with Delta Environmental Consultants, Inc. in January 1990. Nonetheless, by September 1991, Heiby had made no significant progress in recovering or containing the gasoline which had leaked from the storage tank. As a result, pursuant to R.C. 6111.03, the director issued orders requiring Heiby (1) to conduct a thorough investigation of the extent of soil and groundwater contamination resulting from the March 19, 1987 leak, and (2) to implement a comprehensive plan to prevent further groundwater pollution through the removal of contaminated soil and the recovery of any free-phase gasoline.

Heiby appealed the director's orders to the EBR. On February 17, 1993, the EBR rendered a decision vacating the orders as unlawful for lack of statutory authority. The director appeals therefrom, assigning the following errors:

"Assignment of Error No. I:

"The EBR failed to liberally interpret section 6111.03(H) and therefore unlawfully stripped the Director of his authority to abate a potentially toxic discharge before it reached a drinking water supply of Ohio citizens.

"Assignment of Error No. II:

"The EBR's decision ignores the intent of the General Assembly and creates an absurd result."

■ Appellant's two assignments of error are interrelated and together raise the issue of whether the director of OEPA is statutorily authorized to issue orders which require the "clean up" of a gasoline spill to prevent, control, or abate pollution of the waters of the state. The resolution of this issue turns on the scope of the authority vested in the director under R.C. Chapter 6111.[1]

R.C. 6111.03(H)(1) authorizes the director of OEPA to issue, modify, or revoke orders prohibiting or abating discharges of sewage, industrial waste or other wastes into the waters of the state for the purpose of preventing, controlling or abating water pollution.

Without question, the gasoline which has contaminated the soil at appellee's facility constitutes "other wastes." See R.C. 6111.01(D); *Unitea States v. Hamel*

---

1. R.C. 6111.03 provides in pertinent part as follows:

"The director of environmental protection may:
"* * *
"(H) Issue, modify, or revoke orders to prevent, control, or abate water pollution:
"(1) Prohibiting or abating discharges of sewage, industrial waste, or other wastes into the waters of the state;
"* * *
"(O) Exercise all incidental powers necessary to carry out the purposes of this chapter[.]"

(C.A.6, 1977), 551 F.2d 107, 111. Equally clear, the groundwater with which the OEPA director is concerned falls within the definition of "waters of the state" for purposes of R.C. 6111.03(H)(1).[2] Under these circumstances, Heiby concedes that the flow of gasoline from the storage tank was a discharge, but argues that the term "discharge" as it is used in R.C. 6111.03(H)(1) refers only to what it terms an initial "emission of pollutants," in this case the original leak itself; it argues, however, that it does not refer to "the pollutants' subsequent presence in the environment or migration through the soil or water." Thus, the narrow question to be addressed is whether the seepage of gasoline from the soil into the groundwater as a proximate result of Heiby's gasoline spill constitutes a "discharge" for purposes of R.C. 6111.03(H)(1).

■ The term "discharges" is not defined in R.C. Chapter 6111 or elsewhere in the Revised Code. In the absence of any statutory definition, a word or term will be given its plain and ordinary meaning. *Sharp v. Union Carbide Corp.* (1988), 38 Ohio St.3d 69, 70, 525 N.E.2d 1386, 1387. In its plain and ordinary sense, the verb "discharge" normally means: "to emit waste matter" or "to give vent to fluid or other contents." Webster's New World Dictionary (2 Ed.1982) 401; Webster's Third New International Dictionary (1961) 644.

Although nothing in these definitions would exclude the seepage in question from being classified as a discharge, Heiby relies upon *State Dept. of Environmental Protection v. Exxon Corp.* (1977), 151 N.J.Super. 464, 376 A.2d 1339, and *State v. Schenectady Chemicals, Inc.* (1984), 103 A.D.2d 33, 479 N.Y.S.2d 1010, arguing that the term "discharges" as used in R.C. 6111.03(H)(1) was intended to refer only to the direct and immediate cause of a pollutant's release, such as dumping or leaking, and not to any subsequent natural movement of the released pollutant.

In *Exxon*, the state of New Jersey, pursuant to New Jersey Revised Statutes 58:10–23.1 *et seq.*, sought to enjoin defendant therein from discharging petroleum products into the groundwater. The petroleum products at issue were seeping out of the soil on defendant's property as a result of years of dumping such products at the site. The New Jersey Superior Court denied the state's request, holding that the statutory definition of discharge found in New Jersey Revised Statutes 58:10–23.3(c)[3] restricted the meaning of the term, for purposes of New

---

**2.** R.C. 6111.01(H) defines "waters of the state" as:

"* * * all streams, lakes, ponds, marshes, watercourses, waterways, wells, springs, irrigation systems, drainage systems, and all other bodies or accumulations of water, surface and underground, natural or artificial, regardless of the depth of the strata in which underground water is located * * *."

**3.** The New Jersey statutory definition is:

Jersey Revised Statutes 58:10–23.1 *et seq.*, to incidents directly resulting from human activities such as spilling, leaking, pumping or pouring. As a result, the New Jersey court concluded that naturally occurring seepage incident to discharges caused by human activity, such as was occurring at the site therein, was not a discharge within the meaning of the statute.

*Schenectady*, the second case Heiby cites in support of its narrow definition of the term "discharge," involved an action by the state of New York alleging that defendant therein was violating N.Y.Envtl.Conser.Law 17–0501 ("Section 17–0501") by "discharging" various chemical wastes into the groundwater. Defendant had years earlier disposed of large quantities of chemical wastes at a waste disposal site by merely dumping the waste onto the ground. As a result of this activity the soil at the now inactive waste disposal site was contaminated with chemical wastes which slowly were seeping into the groundwater.

The New York court rejected on two grounds the state's position that this seepage constituted a discharge under Section 17–0501. First, the court relied upon the holding in the *Exxon* case, finding that Section 17–0501 similarly defined discharge so as to restrict its meaning to releases resulting directly and immediately from human activity. However, of greater importance to the New York court was that in 1961 Section 17–0501 had been amended to delete from the statute the phrase "allowed to seep." The court deemed the deletion to be done purposefully and with the intent of excluding naturally occurring releases, such as seepage, from the coverage of Section 17–0501.

The decisions in the *Exxon* and *Schenectady* cases clearly are distinguishable from the present case. The term "discharges" is not defined for purposes of R.C. 6111.03(H)(1), nor has this statute been amended in a manner which would indicate a legislative intent to exclude naturally occurring seepage from the statute's coverage. Further, the ordinary meaning of the term "discharges" does not distinguish between naturally occurring emissions, much less those incident to human activity, and those occasioned directly by human activities. Indeed, both the naturally occurring seepage of a wound and the flow of liquid from a waterpipe which results directly from human activity are used by Webster's to illustrate the proper use of the term discharge. See Webster's New World Dictionary, *supra;* Webster's Third New International Dictionary, *supra.*

Moreover, the facts of the *Exxon* and *Schenectady* cases differ significantly from the facts herein. In *Exxon*, the actual dumping, along with the subsequent seepage, occurred many years prior to ICI America, Inc.'s acquiring the property therein; ICI America, Inc.'s subsequent ownership was insufficient to render it

---

" 'Discharge' shall mean, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping."

one who "discharges" pollutants. Similarly, in *Schenectady,* the dumping of pollutants had occurred fifteen to thirty years prior to the state's bringing suit against defendant therein; gradual migration from an inactive site was deemed not to constitute a discharge. By contrast, although Heiby apparently delayed two days before notifying the OEPA of the spill at issue, the OEPA acted immediately upon notification. Indeed, the OEPA apparently was forced to address seepage, rather than actual leaking or dumping, as a result of both Heiby's delayed notification and Heiby's less than successful "efforts" to abate the continuing pollution. Unlike *Exxon* and *Schenectady,* the director herein was addressing an active site of immediate seepage and the proximate results thereof.

Further, Heiby's definition of "discharge" narrows the scope of R.C. 6111.-03(H)(1) in a manner which is inconsistent with the object of R.C. Chapter 6111. Under Heiby's definition, the only discharge which has occurred in the instant case is the initial gasoline leak from the storage tank. While this construction of R.C. 6111.03(H)(1) may initially seem plausible when applied to the facts of this case, a slight modification of the facts illustrates the untenable distinction which results from Heiby's construction of R.C. 6111.03(H)(1).

Heiby apparently argues, under the logical extension of the definition of discharge it advances, that if instead of leaking onto the exposed ground into which it could be absorbed, the gasoline had leaked from the storage tank onto an asphalt surface and flowed across that surface into a storm drain which emptied into a nearby stream, the director could order the leak itself stopped, but he would be powerless to order the erection of a simple barrier around the storm drain to prevent the already leaked gasoline from entering the stream.[4] To the extent Heiby in fact would urge that such a distinction and its consequences are a plausible interpretation of "discharge," we are unpersuaded. Further, to the extent Heiby would suggest that the director, under the hypothetical facts, has the authority to order erection of a barrier around the storm drain, then the same authority would allow the director to abate the gasoline which threatens the underground water herein. R.C. 6111.03(H)(1) was enacted to give the director the authority to protect the waters of the state by issuing orders prohibiting or abating the discharge of waste into the waters of the state, and no reason exists why a legislature so intending would have drawn the distinction which results from Heiby's interpretation of the statute.

Heiby nonetheless argues that defining "discharges" as the director urges results in the director having the authority to issue "clean up" orders in contravention of the plain language of R.C. 6111.03(H)(1).

---

4. Heiby so argues on appeal despite its earlier acquiescence to such a barrier in the form of two containment trenches.

■ Heiby is correct that although R.C. 6111.03(H)(1) authorizes the director to issue "orders * * * [p]rohibiting or abating discharges of * * * wastes into the waters of the state," it does not expressly authorize the director to issue "clean up" orders. However, implicit within the authority to issue orders requiring a party to stop or abate a discharge of pollutants into the waters of the state is the authority to require that the necessary steps be taken to bring about the ordered cessation or abatement of the discharge in question. See R.C. 6111.03(O) ("[t]he director of environmental protection may * * * [e]xercise all incidental powers necessary to carry out the purposes of this chapter"). Although the incidental authority set forth in R.C. 6111.03(O) ordinarily permits the director, for example, to order a valve turned off or a leak repaired, situations arise where stopping or abating a discharge will require more. The present case is such a situation.

■ The purpose underlying the director's orders herein is to bring about the cessation or at least the abatement of the ongoing discharge, or dispersion, of gasoline into the groundwater at Heiby's facility. Unfortunately, due to the unusual circumstances involved, the only means of achieving that end is removing the contaminated soil and any free-phase gasoline from the site. Although the order in question does require appellee to "clean up" the contaminated site, this "clean up" is merely the means of achieving an abatement of the discharge of gasoline into the groundwater, an end which the director is authorized to pursue under R.C. 6111.03(H)(1).

Nonetheless, Heiby argues that had the legislature given the director even incidental "clean up" authority pursuant to R.C. 6111.03(H)(1), it would not have felt compelled to enact R.C. 3734.20, which authorizes the director to clean up hazardous waste sites [5]; and that the clean-up authority granted under R.C. 3734.20 is redundant if R.C. 6111.03(H)(1) is read to include "clean-up" authority. We disagree.

As discussed, the "clean up" authority possessed by the director under R.C. 6111.03(H)(1) is limited to ordering that "clean up" which is necessary to stop or abate the discharge of waste into the waters of the state. By contrast, the director's "clean up" authority under R.C. 3734.20 is much broader. Under R.C.

---

**5.** R.C. 3734.20(B) provides, in pertinent part:

"If an order of the director to abate or prevent air or water pollution or soil contamination or to remedy a threat to public health or safety caused by conditions at such a facility issued pursuant to this chapter or Chapter 3704. or 6111. of the Revised Code is not wholly complied with within the time prescribed in the order, *the director may * * * enter upon the facility and perform those measures necessary to abate or prevent air or water pollution or soil contamination from the facility* or to protect public health or safety, including, but not limited to, measures prescribed in division (B) of section 3734.23 of the Revised Code. * * *" (Emphasis added.)

3734.20, the director may "clean up" certain hazardous waste sites to the extent necessary "to protect public health or safety * * *."

Further, R.C. 3734.20 provides the director with a fast and efficient means to deal with the specialized and highly dangerous circumstances presented by hazardous waste sites. To this end, R.C. 3734.20, in certain circumstances, authorizes the director to enter upon and unilaterally "clean up" a hazardous waste site and to charge the owner for the cost of the cleanup after the fact. However, the "clean up" portion of R.C. 3734.20 provides the director with no authority to order a hazardous waste site owner to perform its own "clean up." Hence, the interpretation the director urges for R.C. 6111.03(H)(1) is not undermined by the explicit "clean up" provisions of R.C. 3734.20.

Given the specialized circumstances that R.C. 3734.20 addresses, as well as the unilateral and broad authority it grants to the director to deal with those circumstances, R.C. 3734.20 cannot reasonably be interpreted to either expand or limit the director's authority under R.C. 6111.03(H)(1).

In the final analysis, Heiby's interpretation would allow the untenable result that one may circumvent the law set forth in R.C. Chapter 6111 by the fortuitous circumstance, be it contrived or otherwise, that the OEPA is unaware of the initial leak of waste pollutants, leaving the director without authority to abate any subsequent seepage of that initial discharge. While such a result may be mandated under language restricting the definition of "discharges" to those occasioned directly by human activity, nothing in the language of R.C. 6111.01 or 6111.03 suggests such a restrictive interpretation of the term. The legislature apparently intended for the term "discharges" in R.C. 6111.03(H)(1) to have the full range of meaning conveyed by its plain and ordinary definition, including the naturally occurring seepage proximately following discharge caused by human activity. As a result, under the facts herein, the natural seepage of waste occurring at appellee's storage facility is a discharge for the purposes of R.C. 6111.03(H)(1). The orders of the director at issue are valid.

Accordingly, appellant's two assignments of error are sustained, the decision of the EBR is reversed, and this cause is remanded to that board for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

CLOSE, J., concurs.

WHITESIDE, J., dissents.

WHITESIDE, Judge, dissenting.

Being unable to concur in the majority opinion, I must respectfully dissent.

The standard of review for this court in reviewing an order of the Environmental Board of Review is as set forth in R.C. 3745.06, whether the order "is supported by reliable, probative and substantial evidence and is in accordance with law." Here only a question of law is presented since the board found only that R.C. 6111.03(H) and 3745.01 do not vest authority in the director to issue the orders in question, stating in part that:

" * * * [T]he original (March 19, 1987) release would have been a discharge, and clearly within the Director's authority to control or abate, but the current 'infiltration into the surrounding soil' four years after the fact would not." (Finding No. 10.)

The crucial statutory provision is R.C. 6111.03(H)(1), which provides that:

"The director of environmental protection may:

" * * *

"(H) Issue, modify, or revoke orders to prevent, control, or abate water pollution:

"(1) Prohibiting or abating *discharges* of sewage, industrial waste, or other *wastes into the waters of the state*[.]" (Emphasis added.)

Some of the controversy centers around whether the word "discharges" is a plural noun or a verb. In my understanding of grammar, the word "discharges" must be used as a plural noun for the remainder of the clause to have meaning. Clearly, the word is not used as either a transitive or intransitive verb in the singular indicative form. Nevertheless, the form of the word is not necessarily determinative. Although the word "discharge" has many varied meanings as a noun, as a transitive verb, as an intransitive verb, and as an adjective, in the context used in the statute, "discharges" can refer either to "acts of discharging" wastes or to that which has been discharged, namely "wastes." The words are "discharges of * * * wastes" and as a unit means the same as "waste discharges."

Nevertheless, this does not necessarily mandate an affirmance of the board's order. The majority uses the word "discharge" only in its intransitive verb form but, even if a verb, it would be used in a transitive verb form since it has an object, namely "waste." Assuming that the soil and the water absorbed therein constitutes "waters of the state," it would make no difference how long the "waste" was in the "waters of the state," it still would be subject to abatement. The fact that four years has elapsed would not matter so long as the "waste discharge" remains in the "waters of the state."

This second issue has not been determined by the EBR. However, R.C. 6111.01(H) defines "waters of the state" as being:

" * * * all streams, lakes, ponds, marshes, watercourses, waterways, wells, springs, irrigation systems, drainage systems, and all other *bodies* or *accumulations* of water, surface and underground * * *." (Emphasis added.)

Thus, the ground water must be either a "body" or an "accumulation" of water to be part of the "waters of the state."

In addition, R.C. 6111.04 provides that:

"No person [without a valid permit] shall cause pollution or place or cause to be placed any sewage, industrial waste, or other wastes in a location where they cause pollution of any waters of the state, and any such action is hereby declared to be a public nuisance * * *."

Accordingly, I would reverse the order of the EBR and remand the cause to it for further proceedings in accordance with law consistent herewith.